**George C. JONES, Plaintiff,**

v.

**B. C. CHRISTOPHER & COMPANY et al., Defendants.**

**No. 78–4192.**

United States District Court, D. Kansas.

Feb. 14, 1979.

Dale M. Sprague, Topeka, Kan., William M. Phelan, Chicago, Ill., for plaintiff.

James W. Sargent, Sargent & Klenda, Wichita, Kan., Lawrence R. Brown, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an action for damages arising from plaintiff's participation in certain commodity futures transactions. Defendants have moved to dismiss. Plaintiff has responded to the motion, and a hearing thereon was held February 7, 1978. Having considered the questions presented · and heard the arguments of the parties, the court enters the following order.

Plaintiff is the former president of a small bank and of various other business entities. The complaint alleges that he engaged in massive commodities trading on his own behalf and on behalf of others. It appears that these transactions went ,ur, and that plaintiff lost significant sums both of his own money and of that with which he had been entrusted. Apparently these transactions were consummated through defendant B. C. Christopher, a commodities trading firm with an office in Wichita,

Kansas. Defendant Baldwin is the employee of Christopher with whom plaintiff apparently dealt. Defendant Glickman was at the time the manager of Christopher's Wichita office. The remaining individual defendants are partners of the firm.

The complaint tracks closely the language of the anti-fraud provision of the Commodity Exchange Act, whose authority it invokes, 7 U.S.C. § 6b. It appears to be plaintiff's contention that defendants knew or should have known that plaintiff was "unsuitable" for the trading in which he was engaging, and that Baldwin (with the condonation of Glickman) encouraged overtrading in order to secure large commissions.

As a result of plaintiff's losses, he has become a party defendant in a score of civil actions brought, presumably, by persons whose money was lost in the transactions. He has also been named a defendant in three criminal actions arising from the same transactions. All remain pending, although in different stages of progress.[1] We proceed to consider the arguments of defendants in favor of dismissal of the present case.

## I. JURISDICTION OF THE COURT; PRIVATE ACTIONS UNDER THE COMMODITY EXCHANGE ACT

Initially, defendants argue that this court lacks subject-matter jurisdiction over plaintiff's claims under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* Their argument is in essence that the Act makes no provision for a private action for damages, and that the 1974 amendments to the Act, P.L. 93–463 (October 23, 1974), vested exclusive jurisdiction over commodity-related grievances in the Commodity Futures Trading Commission established therein.

Defendants concede that prior to the 1974 amendments to the Act, courts implied a private right of action thereunder. The seminal case of this type was *Goodman v. H. Hentz & Co.*, 265 F.Supp. 440 (N.D.Ill. 1967). In *Goodman* the court relied by analogy upon those cases implying a private right of action under Section 10(b) of the Securities Exchange Act of 1934.

*Goodman* and similar cases [2] were relied upon by the Seventh Circuit Court of Appeals in the case of *Deaktor v. L. D. Schreiber & Co.*, 7 Cir., 479 F.2d 529 (1973). Since defendants' argument commences with the fate of the *Deaktor* case in the Supreme Court, we believe the procedural history of the case is worthy of some note. Plaintiffs had brought private actions under the Commodity Exchange Act and federal antitrust statutes against defendants subject to the regulation of the Commodity Exchange Commission, which at that time was charged with the regulation of commodity markets under the Act. Defendants moved the trial court to stay the actions pending presentation of the matters to the Commission. The motion was denied, and defendants took interlocutory appeals. The Court of Appeals held that the questions presented were not so difficult that the special expertise of the Commission was needed, and affirmed the trial court. The Supreme Court granted certiorari and re-

<hr/>

1. The court is given to understand that the civil cases remain pending, and that certain matters therein (notably the taking of Mr. Jones' depositions) have been stayed pending disposition of the criminal actions. One of the criminal actions, brought before another judge of this district, has been dismissed. Jones is appealing the grant of voluntary dismissal to the Tenth Circuit Court of Appeals, contending that the federal government's decision to dismiss the action was motivated by a knowledge that Jones did not possess the requisite mental capacity to be held responsible for his acts, and a desire to see him prosecuted in the state criminal cases where the mental capacity standard is less liberal. At least one of the state criminal cases is scheduled for trial next month. It is safe to assume that it will take considerable time to resolve these collateral cases.

2. *Booth v. Peavey Co. Commodity Services*, 430 F.2d 132 (8th Cir. 1970); *Johnson v. Arthur Espey, Shearson, Hammill & Co.*, 341 F.Supp. 764 (S.D.N.Y.1972); *McCurnin v. Kohlmeyer & Co.*, 340 F.Supp. 1338 (E.D.La.1972); *United Egg Producers v. Bauer Int'l. Corp.*, 311 F.Supp. 1375 (S.D.N.Y.1970); *Anderson v. Francis I. duPont & Co.*, 291 F.Supp. 705 (D.Minn.1968).

versed. *Chicago Mercantile Exchange v. Deaktor*, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973). The Court held that the claims:

> should be routed in the first instance to the agency whose administrative functions appear to encompass adjudication of the kind of substantive claims made against the [defendant]. . . .

*Id.*, 414 U.S. at 115, 94 S.Ct. at 467.

The *Deaktor* case, of course, does not command the dismissal of this action. The Court merely held that there had been an abuse of discretion under the circumstances in the refusal to invoke the doctrine of "primary jurisdiction" and stay the action pending evaluation of the "intricate and technical" facts of the case by the Commission, which has special expertise in the area. The applicability of this doctrine to the case at hand will be discussed below. For our present purposes, however, it suffices to note that:

> [W]hen exhaustion is statutorily mandated, the exhaustion requirement is jurisdictional and the district court must dismiss the action. But when there is no statutory exhaustion requirement, courts must resort to a balancing test to determine whether exhaustion is necessary in a given case.

*Eluska v. Andrus*, 587 F.2d 996, 999 (9th Cir. 1978). It is evident from defendants' brief that they recognize the *Deaktor* case does not command dismissal of this action. They contend, however, that *Deaktor* was a "prelude" to the 1974 amendments which now have withdrawn from the federal district courts subject matter jurisdiction over actions such as that before us.

Defendants' argument is grounded upon the 1974 amendments to 7 U.S.C. § 4a, which created the Commodity Futures Trading Commission (CFTC), and to § 2, which vested the new Commission with "exclusive jurisdiction" with regard to regula-

tion of the commodities market. The 1974 amendments created an administrative reparations procedure for those injured by violations of the Commodity Exchange Act, and vested the CFTC with authority to promulgate regulations, hold hearings, and make and enforce (in the Courts of Appeals) orders of all sorts. Generally speaking, the CFTC is a fully autonomous regulatory agency whose duties and powers are modeled after those of the Securities Exchange Commission and similar agencies.

Defendants cite two cases, *Bartels v. International Commodities Corp.*, 435 F.Supp. 865 (D.Conn.1977), and *Consolo v. Hornblower & Weeks-Hemphill, Noyes, Inc.*, 436 F.Supp. 447 (N.D.Ohio 1976), to support their position that one claiming rights under the Commodity Exchange Act has no immediate right of recourse to a federal district court. In *Bartels* it was indeed stated that there is no implied private cause of action under the Act, *Id.*, 435 F.Supp. at 870. In *Consolo* the court dismissed a private action under the Act on two grounds: first, that *Deaktor* commanded plaintiff to first "exhaust" Commission remedies; and second, that no provision for a private cause of action is made in the Act although the CFTC itself is authorized to initiate action. The court has discovered three other cases which inferentially support defendants' position. In *Rosenthal & Co., Inc. v. Bagley*, 581 F.2d 1258 (7th Cir. 1978), it was declared that the statutory entrustment of reparations claims against registered commodities brokers and others to the CFTC administrative procedure does not violate any right to have such claims determined exclusively in a judicial forum.[3] Although the existence of a private right of action was not in issue, the case helps establish the *possibility* that private suit could be precluded without infringement upon constitutional rights. In *Arkoosh v. Dean Witter & Co., Inc.*, 415 F.Supp. 535 (D.Neb.1976), the court appeared to conceive of administra-

---

**3.** One of plaintiff's arguments in opposition to the instant motion concerns the alleged abridgement of the right to jury trial. We believe the reasoning of the *Rosenthal* case is sound, and are unwilling to declare the repara-

tions procedure unconstitutional, for as will be seen below, its invocation is not the sole means for an aggrieved party to obtain a remedy under the CEA.

tive procedures as exclusive for actions under the Act, although the matter was not really in dispute since the real question presented was the propriety of arbitration of a futures contract. In *Bache Halsey Stuart Inc. v. Hunsucker*, 38 N.C.App. 414, 248 S.E.2d 567 (1978), the court refused to entertain claims that a broker's practices violated state unfair trade practice statutes. The court noted the 1974 amendments to the Act created a regulatory commission with broad powers, whose determinations were appealable directly to a Court of Appeals, and stated in passing that:

> The exclusive nature of that procedure for redress against market members resulting from a violation of the Act is apparent from the cases dismissing actions for failure to exhaust administrative remedies.

*Id.* at 569, *citing Bartels, supra,* and *Consolo, supra.*

This court has considered at some length the question whether a private action may be brought directly in this court claiming violations of the Commodity Exchange Act. We have determined that there *is* a private right of action under the Act, and that dismissal of this case is not commanded by the "exclusive jurisdiction" provision of 7 U.S.C. § 2.

Prior to the 1974 amendments to the Act, resolution of most grievances alleged to involve violations of the Act was accomplished by private action, as noted above, and by actions instituted by the Securities Exchange Commission (which would exercise its power in cases where a commodities contract could be said to constitute a "security"). Cases complaining of such violations were also brought under state statutes relating to securities transactions or upon common-law tort theories. The Commodity Exchange Authority, formerly charged with oversight of the commodities markets, simply had inadequate regulatory powers to curb abusive practices. The 1974 creation of the CFTC was in part a reaction to the inadequacy of the CEA, Levinson, *Abuses in the Commodity Markets: The Need for Change in the Regulatory Structure*, 63

Georgetown L.J. 751 (1975). Congress determined that commodity trading was rapidly increasing, and that commodity markets were playing an ever-increasing role in the United States economy. Smith, *Commodity Futures Trading*, 25 Drake L.Rev. 1 (1975). The 1974 creation of the CFTC was thus a response to the patchwork, ineffective regulation of the increasingly-important commodities markets.

These same amendments are claimed by defendants to foreclose a private right of action and vest in the CFTC exclusive adjudicatory power. When a statute contains no express statement concerning private actions, courts frequently rely upon legislative history to determine congressional intent with respect to the availability of private rights of action. Note, *Implying Civil Remedies from Federal Regulatory Statutes*, 77 Harvard L.Rev. 285, 289 (1963), *cited in* Note, *Private Rights of Action for Commodity Futures Investors*, 55 Boston U.L. Rev. 804, 815 (1975). Therefore, we have undertaken a review of the legislative history of the 1974 amendments, paying particular attention to the "exclusive jurisdiction" provision upon which defendants rest much of their argument.

It appears there was a great deal of concern in Congress over the boundaries of CFTC jurisdiction *vis-a-vis* the numerous other regulatory agencies (notably the SEC) which had exercised their powers in the commodities area. Thus the "exclusive jurisdiction" provision of 7 U.S.C. § 2 appears to have had its genesis in the House version of the bill to ensure such other regulatory bodies would not interfere with CFTC regulation. H.R.Rep.No.93–975, 93d Cong., 2d Sess. 28 (1974); Johnson, *The Perimeters of Regulatory Jurisdiction under the Commodity Futures Trading Commission Act*, 25 Drake L.Rev. 61, 66–67 (1975). The House version was revised in the Senate to make it clear that state as well as federal regulation was preempted. Senate Comm. on Agriculture & Forestry. Report on H.R. 13113, S.Rep.No.93–1131, 93d Cong., 2d Sess. 23 (1974), U.S.Code Cong. & Admin.News 1974, p. 5843; Johnson, *supra*, 25 Drake L.Rev. at

68. It appears the continued existence of private enforcement actions was contemplated by the Senate, for it added the present provision that "nothing in this section [7 U.S.C. § 2] shall supersede or limit the jurisdiction conferred on courts of the United States or of any State." S.Rep., *supra*, at 54, U.S.Code Cong. & Admin.News 1974, at 5870. Thus soon after the passage of the bill one commentator who had paid particularly close attention to the legislative history of the bill noted:

> Although both the House and Senate sought to centralize regulatory jurisdiction over futures trading in the Commission, they did not wish to foreclose injured persons from seeking redress in the federal and state courts.

Johnson, *supra*, 25 Drake L.Rev. at 70. The same conclusion was reached in a recent case which dealt with the existence of an implied private cause of action under the Act:

> Although Congress did not explicitly acknowledge private causes of action in the 1974 Act, there is no evidence that Congress did not intend to interfere with these judicial interpretations. The 1974 Act explicitly states that "[n]othing in [the exclusive jurisdiction] section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2. Senator Talmadge, in presenting the Conference bill to the Senate, noted that "[t]he vesting in the Commission of the authority to have administrative law judges and apply a broad spectrum of civil and criminal penalties is likewise not intended to interfere with the courts in any way." 120 Cong. Rec. 30459 (Sept. 9, 1974). This history precludes finding a congressional intent to overrule the cases that had implied a private right of action for violations of the antifraud and manipulation provisions of the Act.

That conclusion is reinforced by the familiar presumption that the legislature is aware of existing constructions of statutes and does not intend to overrule them if the provision is reenacted in substantially the same form. *Georgia Association of Independent Insurance Agents v. Board of Governors of the Federal Reserve Board*, 533 F.2d 224 (5th Cir. 1976).

The Commodity Futures Trading Commission has also interpreted the Act as implicitly authorizing private causes of action. Statement of the CFTC Concerning Referral of Private Litigation Under the Doctrine of Primary Jurisdiction, 41 Fed.Reg. 18471 (May 5, 1976). It is appropriate to give considerable deference to the interpretation of a statute by the agency charged with its administration. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). This canon of construction strengthens the Court's conclusion that the 1974 Act should not be interpreted as foreclosing a private cause of action for damages under the Act.
*Hofmayer v. Dean Witter & Co., Inc.*, 459 F.Supp. 733, 737–38 (N.D.Cal.1978).

■ That the "exclusive jurisdiction" provision was intended only to clarify "the preemption of all other would-be regulators at every level of government," Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vanderbilt L.Rev. 1, 2 (1976), is evidenced by subsequent litigation concerning conflicts in administrative jurisdiction. It appears that for some time after passage of the 1974 amendments there was a spat between the CFTC and SEC concerning the frontiers of their respective jurisdictions. Johnson, *supra*, 29 Vanderbilt L.Rev. at 26–30.[4] Additionally, there was considerable delay in the appointment of Commission members, and provision had to be made for continuation of jurisdiction by other regulatory agencies whose investigations had com-

---

4. This conflict continues. When amendments to the CEA which eventually became the Futures Trading Act of 1978, P.L. 95–405 (Oct. 1, 1978) were being considered by the Senate Agriculture, Nutrition, and Forestry Committee, the SEC proposed an amendment which would have expanded the jurisdiction of the SEC (and limited that of the CFTC) with regard to futures contracts or commodities options which could be considered a "security." S.Rep.No.95–850, 95th Cong., 2d Sess., at 20 (1978), U.S.Code Cong. & Admin.News 1978, p. 2087.

menced prior to the effective date of the Act. *See, SEC v. American Commodity Exchange*, 546 F.2d 1361 (10th Cir. 1976) (SEC continues jurisdiction as to proceedings commenced before Act); *State v. Coin Wholesalers, Inc.*, 250 N.W.2d 583 (Minn. 1976) (1974 Act precluded state "blue sky" regulation except as to those investigations commenced prior to effective date). It is now established, however, that the SEC and other federal agencies are "stripped" of authority to regulate commodities transactions, *SEC v. Univest, Inc.*, 410 F.Supp. 1029 (N.D.Ill.1976), and that state regulatory agencies are likewise preempted by the "exclusive jurisdiction" of the CFTC. *International Trading, Ltd. v. Bell*, 556 S.W.2d 420 (Ark.1977); *Birenbaum v. Bache & Co., Inc.*, 555 S.W.2d 513 (Tex.1977).

■ We conclude that Congress did not intend the "exclusive jurisdiction" language of 7 U.S.C. § 2 to preclude private action under the Commodity Exchange Act. We are aware, however, that the courts are not unanimous in implying such a cause of action. In many reported cases concerning private actions under the Act, the question is simply not faced. In *Master Commodities, Inc. v. Texas Cattle Management Co.*, 10 Cir., 586 F.2d 1352 (1978), the Tenth Circuit Court of Appeals heard an appeal of a private action under the Act, and determined that *scienter* would be a necessary element of any such action. Since the Court decided plaintiff's evidence did not meet this standard, it found it unnecessary to determine whether a private cause of action exists in the first place; the Court assumed for purposes of its discussion that a claim could be stated. Nevertheless, since it makes little sense to consider the necessary elements of a cause of action whose existence is questionable, we may infer a strong probability that such a cause of action would be recognized in this Circuit. Similar are the cases *Moody v. Bache & Co. Inc.*, 570 F.2d 523 (5th Cir. 1978), in which the Court assumed an action would lie but found the causation element not proven by plaintiff, and *Merrill Lynch, Pierce, Fenner & Smith v. Goldman*, 451 F.Supp. 223 (E.D. Mo.1978), in which the court without discus-

sion of the existence of a right of action proceeded to evaluate the evidence and determine no case had been proven.

Other courts, however, have expressly considered the question since the effective date of the 1974 amendments and have determined that a private right of action exists. *Kelley v. Carr*, 442 F.Supp. 346 (W.D.Mich.1977) and *E. F. Hutton & Co. Inc. v. Lewis*, 410 F.Supp. 416 (E.D.Mich. 1976) both recognized such a right. Although in each the authority cited predates the 1974 amendments, there is no indication either court was ignorant of CFTC's existence and function. In *Hofmayer, supra*, the question was directly addressed and the court concluded that private actions survived the 1974 amendments unimpaired. Finally, in *Fairchild, Arabatzis & Smith Inc. v. Sackheim*, 451 F.Supp. 1181 (S.D.N.Y. 1978) the court refused to decline jurisdiction over a case against the CFTC itself arising from its conduct of an investigation of plaintiffs, in the face of a contention plaintiffs should await the possible institution of a CFTC proceeding:

> The Commodity Exchange Act, 7 U.S.C. § 2 *et seq.* contains no explicit subject matter jurisdictional limitation. That is, except under circumstances irrelevant to the instant situation (discussed below), there is no requirement that questions arising under the Act be determined exclusively or initially by the Commission or any other agency.

*Id.*, 451 F.Supp. at 1185. The "irrelevant circumstances" concerned interference with administrative proceedings and the doctrine of primary jurisdiction. For our present purposes, however, it is sufficient to note that there is recent case authority which recognizes the existence of jurisdiction in the federal district courts to hear commodities-related complaints which have not been presented to the CFTC.

*Bartels, supra*, and *Consolo, supra*, are simply not sufficiently convincing to the court to support a determination there is no private cause of action under the Act. In *Bartels* the existence of such a right of

action is denied in the course of a single short paragraph; no analysis is undertaken and no reasons are given for the court's conclusions. The court in *Consolo*, insofar as it relied upon *Deaktor* as authority for *dismissal* of a private action, was simply in error. We believe the more proper conclusion to be drawn from our scrutiny of the 1974 amendments to the Act is that voiced in Note, *The Commodities Game Has a New Referee*, 52 Chicago-Kent L.Rev. 438 (1975):

> The Act does not clarify the existence or nonexistence of a private action for violation of its provisions, but the argument of the *Goodman* case that Congress did not intend to deprive private persons of a remedy is clearly a stronger one now than it was in 1967. The legislative history of the CFTCA indicates that the purpose of Congress was to further protect the exchange customer, not to deprive him of protection. The proviso in the Act that the jurisdiction of state and federal courts is not superseded supports the presumption that the customer was intended to be further protected by the act.

*Id.*, 52 Chicago-Kent L.Rev. at 459.

At the hearing on this motion, defendants raised a new argument based upon the 1978 amendments to the CEA, P.L. 95–405 (Oct. 1, 1978) [the "Futures Trading Act"]. Section 15 of the 1978 Act makes express provision for the states, through their attorneys general or securities administrators, to initiate actions in federal district courts for violations of the CEA. Defendants argue that this new section indicates Congress does not sanction private rights of action under the CEA except as specifically granted by statute. Plaintiff, on the other hand, contends this amendment was designed only to buttress the regulatory power of the CFTC, which is too small to regulate all aspects of the commodities markets effectively.

▮ We are persuaded by plaintiff's argument in this particular. The legislative history of the 1978 Act indicates it was a response to the limited resources of the CFTC and the reluctance of the states to bring *parens patriae* actions under the CEA after the 1974 preemption of state regulatory authority. S.Rep.No.95–850, 95th Cong., 2d Sess. at 14 (1978). The CFTC itself had stated it lacked the resources to deal with the expanding task of regulating commodities transactions, *Id.* at 15, and it may be safely assumed that the provision for suit by states was enacted to ensure the states would feel free to assist the CFTC's efforts. By analogy to our discussion of the 1974 amendments, we are unprepared to state that a provision enacted in the interest of making the regulatory scheme of the CEA more effective was also intended to foreclose existing private rights of redress.

For these reasons, we conclude that defendants are not entitled to dismissal of plaintiff's action. A private right of action may be implied under the act, and such an action may be initiated in this court.[5] There remains the question, however, whether this court should defer to the administrative processes of the CFTC for resolution of this case pursuant to the doctrine of primary jurisdiction set forth in *Deaktor, supra.*

▮ For many of the same reasons germane to our conclusion that amendments to the CEA have not erased the private right of action thereunder, we hold nothing in the amendments justifies abandonment of the *Deaktor* rationale. While the jurisdiction of the CFTC may not be "exclusive" in the sense argued by defendants,

> . . . this does not mean, however, that Congress has revoked the doctrine of primary jurisdiction. While an injured person may elect to bring suit in a court rather than before the Commission initially, nothing in the Act precludes the Court from referring issues in the case to the Commission for its review.

5. Plaintiff's complaint asserts jurisdiction pursuant to the "federal question" statute, 28 U.S.C. § 1331. At the hearing, plaintiff's counsel asserted (correctly, we believe) that jurisdiction to hear this case is rather granted by 28 U.S.C. § 1337, the "interstate commerce" jurisdictional statute. We will construe plaintiff's comment as a request for leave to amend to allege jurisdiction under § 1337, and will grant leave to do so.

Johnson, *supra,* 25 Drake L.Rev. at 71. If anything, expansion of the CFTC's powers and abilities give even more reason to permit the agency to exercise primary jurisdiction:

> Use of the doctrine of primary jurisdiction will ensure that private suits will not interfere with the agency in its orderly development of precedent or its exercise of discretion in the administration of the statute.

Note, *supra,* 55 Boston U.L.Rev. at 826. Avoidance of any interference with the Commission's administration of the CEA regulatory scheme is the principal reason for invocation of the doctrine. Thus in evaluating the advisability of deferring to the Commission's special expertise in commodity trading matters, we must consider the extent to which administrative relief is available, and whether the Commission has undertaken to exercise such authority.

In this case administrative relief is potentially available; however, there might be a difficulty with timeliness of filing were plaintiff now to seek CFTC jurisdiction. 7 U.S.C. § 18(a) mandates that private petitions be presented to the CFTC within two years after the occurrence or transaction complained of. The fact plaintiff has a statute-of-limitations hurdle to clear in this action, see below, gives us pause in considering the availability of administrative relief. Further, the Commission has not undertaken an investigation or assumed jurisdiction of any dispute arising from plaintiff's commodities transactions. All of the compliance pending against plaintiff appear to be ordinary civil actions filed in courts of law.

Additionally, it is incumbent upon us to determine whether the adjudication of this case would require the resolution of issues within the special competence of the CFTC, which would require the exercise of the Commission's unique expertise. Plaintiff distinguishes this case from *Deaktor, supra,* on the ground that in that case the existence of the alleged price manipulation was a terribly complex question best left to the experts in the field. He asserts that the present case, in contrast, presents a situation where "expertise is not necessary."

■ We are persuaded by plaintiff's argument. The complaint in this case alleges not a complex manipulatory scheme, but rather simple bad advice by brokers who should have known that plaintiff was "in over his head." Two courts have faced a similar question when asked to defer to the CFTC in cases alleging fraud on the part of a registered broker or merchant, and in each case it was determined that invocation of the doctrine of primary jurisdiction was not necessary. In *Hofmayer, supra,* plaintiff alleged various violations of the antifraud and registration provisions of the CEA. After considering the primary jurisdiction doctrine, the court stated:

> Courts afford the traditional forum for damage claims in fraud cases and the special expertise of the Commission will not be needed in such cases. The Commission has taken the same position, encouraging the courts not to apply the doctrine of primary jurisdiction to private causes of action for damages under the Commodities Exchange Act.

*Id.,* 459 F.Supp. at 738. In *Shearson Hayden Stone, Inc. v. Lumber Merchants, Inc.,* 423 F.Supp. 559 (S.D.Fla.1976), one party filed a civil action, and the defendant in that action filed a reparations claim with the CFTC. Each sought a stay of the proceedings against him; thus the question was, who should take initial jurisdiction? The court declined to defer to the agency, and made reference to the CFTC's own statement that:

> The issues raised by a particular fraudulent scheme, however complicated, are entirely within the conventional ability of the courts.

*Id.,* 423 F.Supp. at 561, *citing* FR. Doc. 76–12906 (May 3, 1976).

It may be inferred from the quotations of CFTC opinions in the cases above that the Commission does not particularly invite deferral of private fraud claims from the courts. As plaintiff points out, a potential complainant in a CFTC reparations proceeding must state that no civil actions

based on the same facts set forth in his administrative complaint have been instituted or are pending. 17 C.F.R. § 12.-21(a)(7). Indeed, plaintiff has furnished the court with a copy of an (apparently unpublished) CFTC order, *Barker v. Commodity Management Systems, Inc.*, CFTC Docket No. R77–96 (6/21/78) in which the Commission stayed all action upon a reparations petition in view of the pendency of analogous civil litigation.

It therefore appears to the court that this action should not be stayed pending presentation of the issues therein to the CFTC. There is no indication that the Commission would welcome the case, and we fail to see that any of the issues herein are beyond the capacity of this court to understand or evaluate. We decline to invoke the doctrine of primary jurisdiction in this case.

## II. FAILURE TO ALLOW DISCOVERY

A second ground for dismissal urged by defendants is the plaintiff's asserted failure to submit to discovery. Defendants seek the sanction of dismissal under Rule 37, Federal Rules of Civil Procedure. Appended to defendants' memorandum in support of this motion is a letter from the counsel representing plaintiff in his status as defendant in three criminal actions arising from his financial transactions. The letter states counsel's opinion that the present action "involves substantially the same issues" as the criminal actions. Defendants are notified that counsel asserts the Fifth Amendment privilege against self-incrimination on behalf of plaintiff with regard to the planned deposition of plaintiff. Counsel requests that the deposition be stayed pending resolution of the criminal actions; it appears this has been done in several civil actions *against* plaintiff. Plaintiff's counsel in *this* action has not responded by memorandum to this aspect of the instant motion to dismiss; however, defendant's "criminal counsel" has filed a memorandum with regard to the question of dismissal for failure to submit to discovery, and argued the matter at the hearing. While this is a somewhat unusual phenomenon, we have given full consideration to the brief and arguments of plaintiff's "other counsel," and will comment upon the points raised therein.

Initially, however, we must note that defendants' motion itself is not in order. Pursuant to Rule 37, there must first be a motion to compel discovery and an order compelling same; only then may a proper party move for any sanctions at all. Thus defendants' motion to dismiss is not properly presented at this point, and dismissal could not be granted even were it warranted. On the other hand, we observe that the letter raising the question of privilege could not constitute a proper motion for protective order under Rule 26, and hence defendants have not been obliged to stay the taking of plaintiff's deposition based on the letter alone. Further, had there been such a motion, it is doubtful this court would have granted it in its entirety. We have no doubt that a civil litigant may assert a privilege against self-incrimination in resisting discovery. *United States v. Kordel*, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970); *Duffy v. Currier*, 291 F.Supp. 810 (D.Minn.1968). Further, it is clear one instituting suit does not automatically waive any privilege thereby. *Mitchell v. Roma*, 265 F.2d 633 (3d Cir. 1959). When the privilege is claimed, however, the court will not deny *all* discovery. While a civil litigant may refuse to answer specific questions, or may make partial answers and stop when he believes further comment would incriminate him, *Guy v. Abdulla*, 58 F.R.D. 1 (N.D.Ohio 1973); *Duffy, supra,* he cannot refuse to be deposed altogether. *United States v. Cappetto*, 502 F.2d 1351 (7th Cir. 1974). It appears to the court that plaintiff's deposition should proceed, that plaintiff should raise the Fifth Amendment privilege specifically as to each question as to which he makes the claim, and that defendants should then evaluate the necessity of filing a proper motion to compel answers and thus presenting the matter properly to the court. Because the question then presented would be identical, however, we proceed to comment upon the legal principles involved.

Defendants' argument upon the point is quite brief. They assert a plaintiff's refusal to testify at a discovery deposition will make their preparation of an adequate defense impossible. They cite three cases, two state and one federal, for their assertion dismissal is proper in such circumstances. The responsive brief filed on behalf of plaintiff does not discuss the state cases, and neither shall we, for the propriety of dismissal in a state court, pursuant to state discovery rules and procedures, may differ significantly from federal practice. We have therefore focused entirely upon federal cases in our research. We note, however, the weight of authority in the state courts supports the defendants' position, for the reason set forth in *Anno.* 4 A.L.R.3d 545:

> To permit a plaintiff to obtain the relief he sought of the court while refusing, on the ground of privilege, to testify concerning matters which, if known, could prevent his recovering, has appeared manifestly unfair to some courts . .

*Id.,* at 545.

The brief filed on behalf of plaintiff argues in essence that imposing sanctions upon a plaintiff for refusal to submit to the discovery efforts of the parties he has sued must be discouraged, for it would make assertion of the privilege "costly," citing *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). We would wholeheartedly agree that sanctions should not be imposed when the party resisting discovery on Fifth Amendment grounds is a *defendant* in a civil action. This is the situation presented in *Spevack, supra.* In such circumstances courts routinely grant protective orders, or stay discovery pending the resolution of any criminal actions against the party invoking the privilege. *Dienstag v. Bronsen,* 49 F.R.D. 327 (S.D.N.Y.1970); *Duffy, supra; Harrigan & Sons, Inc. v. Enterprise Animal Oil Co.,* 14 F.R.D. 333 (E.D.Pa.1953); *National Discount Corp. v. Holzbaugh,* 13 F.R.D. 236 (E.D.Mich. 1952). Some of these cases are cited in the brief filed on behalf of plaintiff, as is *United States v. Kordel, supra.* In all these cases the party invoking constitutional protections against self-incrimination were sued as defendants in a closely-related civil action. In such a situation the parties invoking the privilege must be protected as a matter of common sense. Otherwise such persons might run the risk of suffering sanctions or default in a civil action on the one hand, or assisting their own criminal prosecution on the other.

When a *plaintiff* brings suit and then refuses to submit to discovery, however, an arguably different situation is presented. The party asserting the privilege is no longer an involuntary litigant. Although he does not waive his recourse to Fifth Amendment protections by filing suit, we question whether he should be privileged to prosecute an action with the hope of recovering damages while maintaining his role in the underlying transactions in a shroud of secrecy. Plaintiff cites 8 Wright & Miller, Federal Practice and Procedure, Civil, § 2018, for the proposition that:

> To dismiss a party's action . . . merely because he has claimed his constitutional privilege certainly makes the resort to the privilege 'costly.' It is difficult to believe that sanctions of this kind can be defended so long as the present interpretation of the Fifth Amendment stands, and several cases have so held.

*Id.* at 148. Of the "several cases" cited for this proposition, however, only one (state) case involved a *plaintiff's* refusal to answer. *Simkins v. Simkins,* 219 So.2d 724 (Fla.App. 1969). This case has since been overruled. *Minor v. Minor,* 240 So.2d 301 (Fla.1970). The court has located only one case holding squarely that dismissal of a plaintiff's ordinary civil action in such circumstances is unwarranted. The court in *Justice v. Laudermilch,* 78 F.R.D. 201 (M.D.Pa.1978), reached this result relying upon the section of Wright & Miller quoted above, with no lengthy consideration of the principles involved. As will be seen, the weight of case authority in the federal courts does not support such a result.

To be sure, there are other federal cases which appear at first blush to support plain-

tiff's position. *Thomas v. United States*, 531 F.2d 746 (5th Cir. 1976); *Shaffer v. United States*, 528 F.2d 920 (4th Cir. 1975); *Ianelli v. Long*, 487 F.2d 317 (3d Cir. 1973). Upon a closer inspection, however, we believe these cases must be distinguished from that before us for one simple reason: in the cases cited, the civil defendant promulgating the resisted discovery and the actual or potential prosecuting authority in the allied criminal cases were identical. *Thomas*, *Shaffer*, and *Ianelli* were all tax refund cases in which the plaintiff taxpayers brought refund actions on IRS assessments of wagering taxes, then refused to answer potentially incriminatory discovery questions promulgated by the United States. In such a situation, institution of a civil refund action is the only means for the taxpayer to resist the taking of his property. The courts were concerned that the IRS could use this "Catch-22" as a prosecutorial weapon by assessing erroneously high "deficiencies," thereby forcing the taxpayer to choose between paying the assessments or incriminating himself in order to prove his true wagering income:

> It is of course the danger that the collection procedure has been instituted to coerce the taxpayer to incriminate himself with respect to a potential criminal prosecution that gives us pause.

*Shaffer, supra*, 528 F.2d at 922. There is also involved in these tax cases an element of governmental taking of property without compensation or due process which is absent in the typical civil case. *See Ianelli, supra*, 487 F.2d at 318. Finally, when the United States is the defendant in the civil action, steps may be taken to insulate the plaintiff from potentially adverse results of his testimony which are unavailable in an ordinary civil action. In *Shaffer*, for example, the court reasoned that the United States could grant the taxpayer-plaintiff "use immunity" as to the criminal proceedings; if the plaintiff still refused to answer the discovery questions, dismissal would then be a proper sanction. *Id.*, 528 F.2d at 922. Such a possibility was also held open in *Thomas, supra*, although that case was remanded to the trial court without specific instructions for its disposition.

In an ordinary civil case such as that before us, however, the courts are nearly unanimous in holding dismissal a proper sanction for a recalcitrant plaintiff who seeks to recover but at the same time withholds on Fifth Amendment grounds information which might be material to the defense of the party sued. In *Independent Productions Corp. v. Loew's, Inc.*, 22 F.R.D. 266 (S.D.N.Y.1958), two corporate plaintiffs brought a private antitrust action, and the president of one plaintiff claimed a privilege not to respond to discovery questions. The court pointed out the unfairness to defendants of such a stance:

> It would be uneven justice to permit plaintiffs to invoke the powers of this court for the purpose of seeking redress and, at the same time, to permit plaintiffs to fend off questions, the answers to which may constitute a valid defense or materially aid the defense.

> Plaintiffs in this civil action have initiated the action and forced defendants into court. If plaintiffs had not brought the action, they would not have been called on to testify. Even now, plaintiffs need not testify if they discontinue the action. They have freedom and reasonable choice of action. They cannot use this asserted privilege as both a sword and a shield. Defendants ought not be denied a possible defense because plaintiffs seek to invoke an alleged privilege.

*Id.*, 22 F.R.D. at 276–77.

The "sword and shield" metaphor was again invoked in *Kisting v. Westchester Fire Ins. Co.*, 290 F.Supp. 141 (W.D.Wis. 1968). There plaintiff's property was destroyed by fire, and he brought a suit on his insurance contract; the insurer alleged arson as an affirmative defense, and plaintiff refused on Fifth Amendment grounds to answer discovery questions exploring the possibility of his participation in possible arson. The court would not allow plaintiff such liberties:

"Plaintiff's next contention is that the privilege against self-incrimination justifies Kisting's refusal to answer the questions involved. Plaintiffs thus seek to utilize the privilege not only as a shield, but also as a sword. This they cannot do. A plaintiff in a civil action who exercises his privilege against self-incrimination to refuse to answer questions pertinent to the issues involved will have his complaint dismissed upon timely motion. See *Stockham v. Stockham*, 168 So.2d 320, 4 A.L.R.3d 539 (Fla.1964); *Lund v. Lund*, 161 So.2d 873 (Fla.App.1964); *Levine v. Bornstein*, 13 Misc.2d 161, 174 N.Y.S.2d 574 (S.Ct., Kings Co. 1958); aff'd 7 A.D.2d 995, 183 N.Y.S.2d 868 (2d Dept.), aff'd 6 N.Y.2d 892, 190 N.Y.S.2d 702, 160 N.E.2d 921 (1959); *Franklin v. Franklin*, 365 Mo. 442, 283 S.W.2d 483 (1955); Ann. 4 A.L.R.3d 545. Cf. *Zaczek v. Zaczek*, 20 A.D.2d 902, 249 N.Y.S.2d 490 (2d Dept. 1964)."

*Id.*, 290 F.Supp. at 149.

In *Lyons v. Johnson*, 415 F.2d 540 (9th Cir. 1969), plaintiff brought a civil rights action against various police and judicial officers, then invoked Fifth Amendment privileges to resist the defendants' attempts at discovery. The court held dismissal proper in such a situation:

"The naked question therefore simply was whether a plaintiff can refuse to submit to any discovery whatsoever upon his lawsuit, by asserting a Fifth Amendment privilege against any interrogation of him, and then demand that he nevertheless be permitted to continue with the legal pursuit of his claim, no matter what prejudice or possible unequal protection there might be involved to the defendant from such a court acquiescence . . .

Clearly, the process has become increasingly recognized as one of the primary and essential elements in making federal court business flow and in contributing to the accomplishing of trial justice or settlement termination of litigation. The scales of justice would hardly remain equal in these respects, if a party can assert a claim against another and then be able to block all discovery attempts against him by asserting a Fifth Amendment privilege to any interrogation whatsoever upon his claim. If any prejudice is to come from such a situation, it must, as a matter of basic fairness in the purposes and concepts on which the right of litigation rests, be to the party asserting the claim and not to the one who has been subjected to its assertion. It is the former who has made the election to create an imbalance in the pans of the scales."

*Lyons* was followed in *Brown v. Ames*, 346 F.Supp. 1176 (D.Minn.1972), a civil rights action in which plaintiffs claimed they had been falsely arrested. Criminal charges were pending against the plaintiffs with regard to the same occurrence claimed to constitute the false arrest. Plaintiffs refused to answer deposition questions concerning the event. The court held such a position was untenable:

The court does not quarrel with the proposition that each plaintiff can assert his Fifth Amendment right regarding ". . . depositions or interrogatories directed against him in a civil action where the answers might incriminate him in a pending criminal case." *De Vita v. Sills*, 422 F.2d 1172, 1178 (3d Cir. 1970); *Duffy v. Currier*, 291 F.Supp. 810 (D.Minn.1968). Nor will the court here attempt to compel such answers.

█ The sole question presented is whether plaintiffs by commencing the action and submitting themselves to the jurisdiction of the court can be compelled either to waive their Fifth Amendment Privilege and respond to discovery proceedings and later of course to cross examination at trial, or have their Civil Rights action dismissed with prejudice. The court answers this question in the affirmative . . .

Analogy is drawn to the well settled rule that a defendant in a criminal case may choose not to testify, claiming his privilege, but once he voluntarily takes the witness stand, he cannot thereafter object and refuse answers on cross examination or otherwise claim a privilege.

The case at bar is not of course one where a defendant in a civil action seeks to invoke the privilege. He may do so. See *Duffy v. Currier, supra.* Nor is the court here willing to hold, that merely by bringing the action plaintiffs have irrevocably waived their privilege, but rules only that to còntinue to prosecute their action further plaintiffs either must do so; else their action will be dismissed. They have an election.

*Id.,* 346 F.Supp. at 1177–78.

Again, in *Penn Communications Specialties Inc. v. Hess,* 65 F.R.D. 510 (E.D.Pa. 1975), a plaintiff refused to respond to discovery on Fifth Amendment grounds. The court dismissed the action, holding that plaintiff was *not* being "penalized" for his assertion of the privilege since his choice to initiate the action had been voluntary.

The court has located only one case arising in this Circuit dealing with the problem at hand. In *Bramble v. Kleindienst,* 357 F.Supp. 1028 (D.Colo.1973), the plaintiff was arrested for trafficking in drugs and his car became the subject of a forfeiture proceeding. His prosecution on the criminal charges was deferred, and he brought an action to compel the return of his automobile, challenging the constitutionality of the forfeiture statutes. He refused to respond to discovery on Fifth Amendment grounds. The court determined the constitutional claims were insubstantial, but also dismissed the action for the refusal to submit to discovery. The decision was appealed to the Tenth Circuit Court of Appeals, where the statutory scheme was held constitutional. *Bramble v. Richardson,* 498 F.2d 568, *cert. den.,* 419 U.S. 1069, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974). The court did not discuss the propriety of the alternate grounds for dismissal.

 We conclude that there is substantial case authority supporting the position of defendants. Plaintiff should not be able to "have his cake and eat it too." While it may be true that an individual should not suffer penalty for the assertion of a constitutional right, neither should third parties sued by that individual, who have no apparent interest in his criminal prosecution, be placed at a disadvantage thereby. In this case plaintiff prays for an award of twenty million dollars from defendants for their alleged involvement in a complex, fraudulent series of transactions, but appears unwilling to disclose any relevant information about his (presumably important) role in them.[6] The potential for prejudice to defendants is simply too great to deny them some recourse, including the possible sanction of dismissal.

We find, therefore, that dismissal for refusal to respond to discovery is a potentially proper sanction should plaintiff's position remain unaltered. We repeat, however, that such harsh sanctions cannot be invoked in the present posture of the case. Perhaps the criminal prosecutions of plaintiff will be resolved by the time this question faces us directly, *cf. Corbin v. F. D. I. C.,* 74 F.R.D. 147 (S.D.N.Y.1977), or perhaps some lesser sanction may be formulated which accommodates ·the interests of both sides. The grant of a stay of the deposition, as suggested in this case, would be an attractive alternative only if resolution of the criminal cases would satisfy plaintiff that no other prosecutions could be brought, and hence would erase the need to assert the privilege. The possibility also remains that some *res judicata* or collateral estoppel effect might inure in the pending criminal cases which would provide defendants with an absolute defense. It is mere speculation to talk of such alternatives at this stage, however. We conclude that dismissal is a potentially appropriate sanction, but that no sanction may be invoked at this time. Defendants' motion to dismiss on this ground must now be denied.

---

**6.** The possibility of a waiver of plaintiff's Fifth Amendment rights was raised by defendants at the hearing, based upon their understanding that plaintiff made statements and cooperated fully with the FBI while the federal criminal investigation was pending, and only later assumed his current stance. This matter has simply not been properly presented to the court, and we decline to speculate upon the effect of any asserted waiver.

## III. STATUTE OF LIMITATIONS

Finally, defendants claim plaintiff's action is now barred by the applicable statutes of limitation. Attached to the motion is the affidavit of defendant Glickman, manager of the Wichita office of defendant B. C. Christopher & Co., which states that he is familiar with the accounts of plaintiff maintained by that office, and that plaintiff's last commodity transaction with defendants occurred on June 25, 1976. Defendants argue that since this action was filed June 30, 1978, more than two years after plaintiff's last commodities transaction, it is barred.

Defendants cite K.S.A. § 60–513, the general two-year tort statute of limitations applicable to plaintiff's state law claims, and 7 U.S.C. § 18(a), which provides a two-year limitation for petitions to the CFTC. We entertain some doubt as to the "transferability" of this latter limitation period to a private court action based upon the Commodity Exchange Act. Only one case appears to have considered the limitations question in the context of such a private action. In *Bache Halsey Stuart Inc. v. Namm*, D.C., 446 F.Supp. 692 (1978), the court observed the Act does not provide a limitation period for civil actions brought under its provisions, and concluded that federal courts entertaining such actions must look to the most closely analogous cause of action under state law and apply the state statute of limitations applicable thereto. Federal law, however, determines such matters as tolling and accrual; the period commences to run not when plaintiff discovered his injury, but rather when he *should have* discovered it. *Id.*, 446 F.Supp. at 698.

The present action complains in essence of fraud and breach of fiduciary duties in violation of § 6(b) of the Act. Clearly the "most analogous" state statute of limitations would be K.S.A. § 60–513, which as noted above prescribes a two-year limitation period.[7] The statute provides that "the cause of action shall not be deemed to have accrued until the fraud is discovered." Judicial constructions of this provision, however, have held that the period should begin running when the fraud is known or through the exercise of reasonable diligence could have been discovered. *Wolf v. Brungardt*, 215 Kan. 272, 524 P.2d 726 (1974).

■ It therefore appears there is no real conflict between the limitations applicable to plaintiff's federal and state claims. Each is subject to a two-year limitation which commences running when the aggrieved party knows or should have known of his injury.

■ Plaintiff in his response to the motion of defendants (which, in light of the inclusion of a sworn affidavit, must be treated as a motion for summary judgment), brings the court's attention to the existence of an endorsed check dated precisely two years prior to the institution of the action, which purports to be a settlement of all accounts between defendants and plaintiff. For the reasons stated in Note 7, *supra*, such matters are largely irrelevant, except insofar as plaintiff's failure to endorse and cash the check signifies an awareness of injury soon after its execution. Plaintiff's criminal counsel, however, contended at the hearing that plaintiff could not have been aware of the fate of his business transactions until he began receiving treatment for his psychological difficulties in July of 1976, a time within the limitations period. It appears to the court that the date when, in the exercise of due diligence, plaintiff should have discovered the wrong, is subject to material dispute. "Seldom is it possible for such an issue to be

---

7. Plaintiff, in reply to the motion, asserts that the three-year limitation of K.S.A. § 60–512, applicable to contracts not in writing, should be applied in this action. This position is simply untenable. The complaint in this case alleges fraud, deception, and manipulation. It is well-settled in this district that K.S.A. § 60–513(3) provides the proper and "most analogous" limi-

tations period to be applied in securities actions alleging like wrongs. *Seiffer v. Topsy's International, Inc.*, 64 F.R.D. 714, 716 (D.Kan.1974); *Brunner v. Bush & Co., Inc.*, No. 75–88–C5 (D.Kan., 9/29/77, unpublished). *See also, Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968). For the reasons stated in *Namm, supra*, the same reasoning is applicable to CEA actions.

determined summarily." *Seiffer v. Topsy's International, Inc.*, 64 F.R.D. 714, 716 (10th Cir. 1974). Determination of the limitations question, therefore, must await the determination of the facts at trial.[8]

## IV. CONCLUSION

For the reasons stated above, defendant's motion to dismiss will be overruled and denied in its entirety. While there may be merit in certain of the points raised, none merit dispositive action at this stage of the litigation.

IT IS SO ORDERED.

---

**8.** Plaintiff and defendants have waived the right of trial by jury by failure to make timely demand. Rule 38(b) and (d), Federal Rules of Civil Procedure. The court considered this factor in our conclusion that that action is not so complex as to merit exercise of the doctrine of primary jurisdiction. See pp. 222–223, *supra.*